**James D. LEE, Plaintiff–Appellant,**

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, Defendant–Appellee.**

No. 89–2861.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1990.

Decided April 2, 1991.

Amended by Order Aug. 12, 1991.

---

Deborah Kay Garton, Hensley, Muth, Garton and Hayes, Bluefield, W.Va., argued, for plaintiff-appellant.

Margaret J. Krecke, Office of Gen. Counsel, Department of Health and Human Services, Philadelphia, Pa., argued (Beverly Dennis, III, Chief Counsel, Region III, Charlotte Hardnett, Chief, Social Sec. Litigation Div., Victor Jerry Pane, Asst. Regional Counsel, Office of Gen. Counsel, Department of Health and Human Services, Philadelphia, Pa., Michael W. Carey, U.S. Atty., and Stephen M. Horn, Asst. U.S. Atty., Charleston, W.Va., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, and RUSSELL and SPROUSE, Circuit Judges.

PER CURIAM:

The plaintiff, James D. Lee, appeals the affirmance by the district court of the Secretary's denial of his claim for Social Security disability benefits and Supplemental Security Income benefits under Title II and Title XVI, respectively, of the Social Security Act. The Secretary found that the plaintiff was not entitled by his alleged disability to either disability or supplemental security income benefits. The plaintiff disputes this finding as unsupported by substantial evidence. The district court considered that the Secretary's findings were supported by substantial evidence and sustained the Secretary's dismissal of the claim. We affirm this denial of benefits.

I.

The plaintiff is a 46–year–old male who had been employed for some twenty years as a millwright or mechanic at the Celco plant of Celanese Incorporated in Narrows, Virginia. He discontinued such employment on November 5, 1986, because he allegedly became physically unable to perform his normal work duties at the plant. His primary physical complaint was later diagnosed as a Grade I spondylolisthesis.[1]

---

1. In common vernacular, spondylolisthesis is defined as "inflammation of the vertebrae," Random House Dictionary of the English Language 1374 (Ed.1973), or, in medical terms, "a forward displacement or slipping of a vertebra," *Bush v. Brunswick Corp.,* 92 Mich.App. 686, 285 N.W.2d 420, 422 (1979), or "a forward disloca-tion of one or more vertebrae on the one below," 1C Gray's Attorney's Textbook of Medicine, § 1772(3a) (Matthew Bender, Ed.1970, Supp.1987). Specifically, spondylolisthesis at L5–S1, which is the diagnosis here, is "a subluxation or partial dislocation of the fifth vertebra, fifth lumbar vertebra or the first sacral ver-

Accordingly to his statement, this condition made it too painful for him to perform the normal lifting and bending requirements of his job. He traced his condition to an extreme jolt sustained by him while riding in a National Guard truck during reserve exercises in July 1986. He consulted Dr. Robert W. Sandell, a chiropractor in Union, West Virginia, about his condition on the day he discontinued work.

Dr. Sandell submitted a report on March 27, 1987, to the plaintiff's employer on his treatment of Mr. Lee up to that date. He summarized in this letter the result of the physical and x-ray examination of the plaintiff as revealing that the plaintiff's primary disability to be a "Grade I anterior spondylolisthesis of L5 on S1 [resulting in] ... a marked increase of the lumbosacral angle accentuated by poor posture and overweight, narrowing of L4/L5, L5/S1 intervertebral foramen and degenerative changes starting in the L5/S1 disc." He added that he had initially put the patient on treatment "of a conservative nature using mild chiropractic adjustments to improve neuromuscular skeletal function." At the time of this report, Dr. Sandell said "[t]he patient has made very good progress but still has some mild to moderate soreness in his low back which is aggrevated [sic] when he does any vigorous activities." Dr. Sandell referred to a fall on ice by the patient on February 23, 1987, which exacerbated somewhat his "symptoms that have not completely resolved." He concluded his report by stating that the patient's "symptoms have not cleared up enough to enable him to return to his normal work duties." He referred the patient to Drs. Louis P. Ripley and William A. Merva for further examination and diagnosis.

The record includes statements by both Dr. Ripley and Dr. Merva. In his statement, Dr. Ripley, a medical orthopedist, said that he had earlier seen the plaintiff in August of 1986 when he complained of "problems involving both of his knees ... and he was not incapacitated at that time." However, on referral he saw the plaintiff again on February 4 and 5, 1987. The plaintiff told Dr. Ripley at that time that he had "developed some increasing discomfort," had quit work on November 5, 1986 because of such discomfort, and had begun at that time a treatment prescribed by Dr. Sandell. This treatment consisted "of the use of an alignment machine, an adjustment, ultrasound, vibrating massage and exercise program" three times a week for three months and then two times a week. Clinical examination of the plaintiff revealed that his reflexes were "active and equal," his neurological examination was "negative," his "leg lengths [were] equal," "toe extensions [were] strong. There is moderate discomfort to palpation right over the lumbosacral joint." Review of the x-rays showed "a Grade I spondylolisthesis with bilateral pars defect at the L–5, S–1 level." His complete diagnosis, based on both the clinical and x-ray reviews, was:

> I would feel that this patient's major problem is that of a spondylolisthesis, Grade I which is, at this point, mildly symptomatic. I don't feel that manipulations would be beneficial at this time, but would rather suggest continued use of his exercise program to build up his own compensatory muscle strength. The use of a low back support on a symptomatic prn basis would be beneficial. The loss of some weight would certainly help as well. I would feel that this man would benefit from work that did not require extremely heavy lifting or bending and will so inform his employer's [sic] at Celanese with the hopes that he might be able to be assigned to selective work.

Dr. Merva, a neurologist, in his historical review of the plaintiff's condition, referred to the plaintiff's accounts of his fall on the ice and his involvement "in a trucking accident while in the National Guard" as factors exacerbating his back pain. Dr. Merva then diagnosed the plaintiff's "back and leg problems [as] most probably secondary to anterior spondylolisthesis of L–5

tebra." *Bryant v. Masters Mach. Co.,* 444 A.2d 329, 332 (Me.1982). It is classified in four grades: Grade I, the lowest, describes 0 percent to 20 percent slippage, and Grade IV, the highest, represents complete forward displacement. *See Medical Evaluation of Orthopedic Disability.*

and S–1, especially because of the recent history of trauma." He recommended that if the plaintiff's pain continued, "myelography may be indicated ... [and] pt. might even be a candidate for spinal fusion." He also inquired of the plaintiff whether "returning to work would make the situation worse." The plaintiff's response was that "there is a lot of heavy work in his job and he feels this definitely makes his back pain worse." Dr. Merva agreed.

Dr. Merva again saw the plaintiff on April 22, 1987. At that time, a myelogram and CT scan of plaintiff's spine were performed. Other studies were also conducted, including "CBC and differential, sedimentation rate, RPR, creatinine, BUN, lytes, analysis of spinal fluid, and Chem–12." All such tests "were within normal limits with the exception of a mildly elevated blood sugar but the patient had an IV at the time." The "Principal Diagnosis" was spondylolisthesis.

On September 2, 1987, the plaintiff was seen by Dr. Yogesh Chand, an orthopedic surgeon. Dr. Chand examined the plaintiff and reviewed his medical record. He referred to the lumbar myelogram and CT scan performed "which showed no evidence of nerve root compression" and an EMG and nerve conduction study which showed no "evidence of nerve root entrapment." At the physical examination, the plaintiff "showed tenderness of the low back at the L5 sacral area with a palpable shift of L5 on sacrum." X-ray studies revealed "a Grade I spondylolisthesis of L5 on sacrum. Otherwise the lumbosacral spine was normal." His diagnosis was that the plaintiff had "a mechanical type of low back pain secondray [sic] to the spondylolisthesis at the L5 sacral level with degenerative changes there." He suggested the plaintiff might have a spinal fusion. "In terms of functional capabilities," he expressed the opinion that the plaintiff was "unable to do work that requires more than fifteen pounds of weight lifting on a continuous basis" and was incapable "of sitting, standing or walking for more than thirty minutes at a time."

The plaintiff was concerned about the recommendation of a fusion by Dr. Chand and Dr. Merva. He asked that an appointment be secured for an examination by the medical staff at Duke University Medical School. The appointment was made and an examination of the plaintiff was conducted at that institution. The result of such examination on January 14, 1988, was summarized in the report of Dr. William Richardson of the Hospital's orthopedic staff:

> reveals an overweight white male in no acute distress. His gait is normal. He can heel and toe walk. He has mild tenderness to percussion of the left paralumbar muscles. Straight leg raising is negative both sitting and lying. He has good range of motion of the hips without discomfort. He can flex fingertips to mid thigh only. Extension is about 20 degrees of increased pain also. Motor is exam is 5/5. Deep tendon reflexes are symmetric. Sensation is intact to light touch and pin prick. X-rays revealed a Grade I spondylolisthesis with bilateral pars defects L5–S1. Report of myelogram and CT scan from April 1987 showed no evidence of nerve root impingement.

Dr. Richardson gave this "Assessment" of the plaintiff's condition: "Grade I spondylolisthesis L5–S1 with mechanical back pain." His "Recommendation" was:

> I have discussed options with Mr. Lee. Currently, he would prefer to continue with nonoperative approach using a corset, exercise program and nonsteroidal medications. I think that age 46 and with primarily mechanical symptoms and a spondylolisthesis, that the potential benefit from decompression and fusion are significant. He elects in the future to have this procedure done. I would be happy to see him back. Currently, he is disabled being unable to lift anything greater than 15 to 20 pounds or stand, walk, or sit for more than 30 minutes at a time.

The plaintiff also sought VA disability benefits during this time. In connection with that claim, he was examined and his disability was evaluated by the Veterans Administration. At the request of the

plaintiff that record was incorporated into the record of this case. Examinations conducted by the VA medical staff established that the plaintiff had normal leg raising ability without pain or disability, a back extension to 20 degrees, and lateral bending to 35 degrees. Review of myelogram and x-rays demonstrated no evidence of disc herniation. The VA found the plaintiff, as had the other physicians, to have a Grade I spondylosis of the lumbar-5 disc. The VA, on this record, granted the plaintiff only a 20 percent disability claim.

Dr. Sandell filed this statement, dated September 2, 1988, after the filing of the report of the administrative law judge herein and considerably after the testimony of the vocational expert:

Having treated the patient these many months and in light of the information presented, it is my opinion that Mr. Lee is not a candidate for sedentary work. It is my opinion that Mr. Lee's condition has deterioated [sic] some already in the past year and I feel that even a sedentary position will result in increased spinal and related organ health problems.

Dr. Sandell is a chiropractor. The Regulations provide that, as such, he does not qualify as an "acceptable medical source" to make a "medical assessment" on a Social Security claimant's "ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling." *See* 20 C.F.R. § 416,913. At best, Dr. Sandell's assessment can qualify only as a layman's opinion.

So much for the medical records.

The plaintiff himself testified. He gave his age as 46 and his schooling up to the tenth grade. He had, however, completed a high school GED while in the military service. He had worked for Celanese for twenty years as a millwright or mechanic. Such employment had been continuous except for a period of military service between May of 1963 and May of 1966. His work required from time to time bending, and lifting of heavy tools and materials. He began to experience difficulty at his work following a severe jolt he received while riding in a National Guard truck in July 1986. In early November of 1986, he was forced to discontinue work. He described the conditions causing such work termination:

I had a problem, we had a lot of standing work to do at that time, and I had problems doing that due to pain and it, of course, it aggravated my nervous system and I couldn't tolerate, you know, an instance on the job and so forth. And the situation wears a lot a stress, I just had to get out of it, for now.

He testified that he tried to go back to work at a lighter job but his employer told him there were no openings in such classification at the time. He, however, undertook a muscle-hardening program as recommended by the plant doctor at Celanese. The third day of this program, he experienced pain in lifting "some weights," and Dr. Sandell advised him to quit the program, which he did. He has not sought work since that time.

The plaintiff testified to "having a lot of pain in [his] lower back and through my spine, my neck and I have headaches continuously." He goes for "short walks each day and they, this bothers me because of the pain and the soreness." Dr. Chand and Dr. Sandell have put him on an exercise program which he observes. Under this program, he engages in "back strengthening exercises." He does a lot of walking but generally "at the very most a mile at a time" because "when [he] walk[s] a half a mile, [he] start[s] having worse problems with my left knee and foot." He can drive his car but driving "makes [his] back problem worse, soreness and pain." He repeated that Dr. Sandell and Dr. Chand had recommended, as he remembered, that he engage in no lifting greater than fifteen pounds, and no sitting, standing, or walking for over thirty minutes on a stretch.

A vocational expert also testified in person before the administrative law judge. The qualifications of the expert were accepted. A hypothetical, which included the plaintiff's age, educational background, work record, his medical evaluation and his work limitations as stated by Dr. Richard-

son, Dr. Chand, and Dr. Ripley, was answered by the vocational expert thus:

Well, with those limitations, Your Honor, I would not consider him capable of working at any of the jobs I cited. The restriction for thirty minutes for sitting, standing or walking would reduce him to work performed strictly at the sedentary level and providing an option of standing or sitting as he wished, and those kinds of jobs would be limited. The only jobs that I would cite that would permit that kind of an opportunity would be security guard work, such as a gate watchman, and of the sedentary, of the approximately 19,000 security guards in Virginia, estimate probably twenty percent would permit that kind of activity, and twenty percent of the 6500 I cited for West Virginia. Possibly as a cashier in self service stations, parking lot facilities and so on, this would permit optional standing and or walking. Sedentary cashiering jobs in Virginia, approximately 20,000, approximately 5500 in West Virginia.

Counsel for the plaintiff sought to counter this testimony by adding to the plaintiff's disability by introducing a requirement that the plaintiff be permitted to recline several times a day during work. That qualification was not sustained by the evidence, and the vocational expert's testimony in answer to the question was without support in the record. No physician suggested that the plaintiff's condition required such reclining. The plaintiff was asked, "[W]hat's the most comfortable position for you to be in?" His answer was: "Laying down or in a recliner. Laying flat on the floor, I usually get more relief when I lay right flat down on the floor." That was the only reference to "reclining." The plaintiff never testified that while at work, he had stopped working and lay on the floor nor did he testify that he ever did this regularly at any time; the most he testified to and that the medical opinion suggested was that he could not "walk," "sit," or "stand" more than thirty minutes at a time.

On that record, the administrative law judge made his decision. After reviewing the evidence, both live and documentary, he found that the plaintiff was "unable to perform his past relevant work as a millwright," that the plaintiff's "residual functional capacity for the full range of light work would be reduced by lifting more than 20 pounds, with some indication that there would be additional pain limitations on standing, walking, or sitting," that "[a]lthough the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which he could perform," and that, accordingly, the plaintiff was not under a "disability" entitling him to disability benefits under Social Security. The plaintiff sought rehearing before the Appeals Council. That appeal was denied, and the "Administrative Law Judge's decision stands as the final decision of the Secretary in [the] case."

On appeal, the district court, by consent, referred the matter to the magistrate judge for hearing and decision. After a hearing, the magistrate judge filed his opinion. In his decision, the magistrate judge first found that the administrative law judge had erred by finding that "the plaintiff could perform light work with the limitation that he could not sit, stand or walk for more than thirty minutes at a time" since the vocational expert had testified that the plaintiff was not disabled in that, with his work limitations, plaintiff qualified only for "sedentary work." He, however, held that the error was harmless because the vocational expert had testified "that the plaintiff, even with the limitations as indicated, there were jobs at the sedentary level that Mr. Lee could perform." The district court accordingly found that the Secretary's decision was supported by substantial evidence, and it affirmed the denial of relief to the plaintiff. The plaintiff has appealed.

## II.

■ The first contention advanced by the plaintiff follows to some extent the magistrate judge's decision. He would find error in the administrative law judge's finding that the plaintiff could perform

"light work" when actually the evidence of the vocational expert would only sustain a finding of ability on the plaintiff's part to perform "sedentary work." He argues that since the administrative law judge found the plaintiff could perform "light work" and the vocational expert testified that the plaintiff could only perform "sedentary work" (a lower standard than "light work"), the decision of the administrative law judge was improper and such impropriety could not be dismissed as harmless but required either reversal or remand. We think the objection is not well taken.

Both "light work" and "sedentary work" are defined in 20 C.F.R. § 404.567(a) & (b). The basic distinction between the two classifications is the weight-lifting ability of the claimant: "sedentary work" involves "lifting no more than 10 pounds at a time" and "light work" includes "lifting no more than 20 pounds at a time." The medical testimony is confusing on the weight-lifting capacity of the plaintiff. Dr. Chand, for instance, placed a limit of 15 pounds on such capacity, whereas Dr. Robinson fixed the limit at no "greater than 15 to 20 pounds." The plaintiff himself used the 15–pound limit. Under this testimony the weight-lifting capacity of the plaintiff exceeded the limit fixed for "sedentary work" but it was, by Dr. Robinson's testimony, equal at its maximum to the weight-lifting level of "light work." The administrative law judge recognized the problem here. He sought to take a reasonable stance between the two levels of "light" and "sedentary" work by finding that "the claimant's additional nonexertional limitations do not allow him to perform the full range of light work" but that his residual functional capacity to perform was such that there were "a significant number of jobs in the national economy which [the plaintiff] could perform." We think this was an accurate assessment of the plaintiff's work capacity and we find no inconsistency in the administrative law judge's evaluation of the plaintiff's work level in what was a reasonable adjustment between "light work" and "sedentary work."

■ We do agree with the magistrate judge and the Secretary that the record supports the latter's determination that the plaintiff does not qualify for benefits herein. The plaintiff's functional work capacity was thoroughly examined in the light of all the medical evidence, including the disability testimony of the plaintiff himself, by the physicians who had seen the plaintiff and heard all his complaints, including those of pain. None of these physicians gave an opinion that the plaintiff was totally and permanently disabled. In fact, there were clear indications that some of them definitely felt that working would have been beneficial to the plaintiff. Thus, Dr. Ripley stated in his report that he "fe[lt] that this man would benefit from work that did not require extremely heavy lifting or bending." The plaintiff accepted this evaluation and applied for "light work." The Celanese plant official seemed to have agreed with this evaluation and he apparently "attempted to get Mr. Lee on some type of restricted duty at Celanese but this was not available." Moreover, every medical doctor who examined the plaintiff gave him an assessment of exactly the work level at which the plaintiff could perform. This assessment was made on the basis of their physical examination of the plaintiff plus the review of the x-rays, CT scans and other tests of the plaintiff and review of his history of pain. There was no nerve compression or nerve root entrapment. Dr. Ripley's examination was complete. The plaintiff did have spondylolisthesis but it was the mildest type of such ailment. Normally, the ailment is not considered to be totally disabling below Grade IV. The VA, on the same record, made an assessment of the plaintiff's Grade of spondylolisthesis as contributing but a 20 percent disability. Of course, the VA test for disability is not precisely that followed under Social Security standards but an assessment as low as 20 percent is significant in any assessment of the plaintiff's work level. As we have said, none of these gave an opinion that the plaintiff could not perform at any work level. And it was that work level, established by their examination and consideration of the plaintiff's history of

pain, which was submitted to the vocational expert for his determination of whether there were jobs in the national economy for which the plaintiff with all his limitations would qualify. The expert answered that there were such jobs available to the plaintiff. Considering all these circumstances, we conclude the administrative law judge's findings denying disability benefits herein were supported by substantial evidence.

The judgment below is accordingly

AFFIRMED.