Sandra L. ROSS, Plaintiff,

v.

Donna SHALALA, Secretary of Health and Human Services, Defendant.

Civ. A. No. 93–2102.
Doc. Nos. 7, 9 and 12.

United States District Court,
W.D. Pennsylvania.

Oct. 14, 1994.

Karl E. Osterhout, Robert Peirce & Associates, Pittsburgh, PA, for plaintiff.

Michelle O. Gutzmer, U.S. Attys. Office, Pittsburgh, PA, for defendant.

## MEMORANDUM ORDER

D. BROOKS SMITH, District Judge.

On June 15, 1994, this action was referred to United States Magistrate Judge Francis X. Caiazza in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and the Local Rules for Magistrates. The Magistrates Act allows the parties ten (10) days from the date of service to file written objections to a report and recommendation.

The magistrate judge's report and recommendation was filed on September 8, 1994, and recommended that plaintiff's and defendant's motions for summary judgment be denied and that the action be remanded to the Secretary for further consideration. Service of the report and recommendation was made on all parties and no objections have been filed. After review of the pleadings and documents in the case, together with the report and recommendation, the following order is entered:

AND NOW, this 14th day of October, 1994;

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment, Document No. 7 is DENIED.

IT IS FURTHER ORDERED that defendant's motion for summary judgment, Document No. 9 is DENIED.

IT IS FURTHER ORDERED that this action is remanded to the Secretary for further consideration.

The report and recommendation of Magistrate Judge Caiazza, Document No. 12, dated September 8, 1994, is adopted as the opinion of the court.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

CAIAZZA, United States Magistrate Judge.

### I. RECOMMENDATION

It is recommended that defendant's motion for summary judgment (doc. no. 9) be denied. It is further recommended that plaintiff's motion for summary judgment (doc. no. 7) be denied. It is further recommended that this action be remanded to the Secretary for fur-

ther consideration for the reasons stated herein.

## II. *REPORT*

This is an action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Secretary of Health and Human Services (Secretary). The Secretary denied the application of Sandra Ross (claimant) for Supplemental Security Income (SSI) benefits.

### I. *Procedural History*

Claimant applied for SSI benefits on July 24, 1990, asserting that she was disabled since March 1, 1987 by diabetes, asthma and stomach problems. (R. 103–06.) Her claim was initially denied on October 16, 1990. (R. 107–09.) Claimant filed a request for reconsideration on October 25, 1990, and her claim was again denied on December 4, 1990. (R. 110–14.) Claimant filed a request for a hearing before an Administrative Law Judge (ALJ) on December 20, 1990, and a hearing took place before ALJ Frank D. DiCenzo on June 19, 1991. (R. 115–16, 31–44.) On October 16, 1991, ALJ DiCenzo denied SSI benefits to the claimant. (R. 286–93.) On December 11, 1991, claimant filed a request for reconsideration and on August 7, 1992, the Appeals Council remanded the case to ALJ DiCenzo for further consideration of claimant's pain medication, diabetic and respiratory impairments, and alcohol consumption. (R. 294–98.) On August 27, 1993, ALJ DiCenzo held a supplemental hearing at which claimant and vocational expert Samuel E. Edelmann testified. (R. 50–75.) On October 7, 1993, ALJ DiCenzo again denied SSI benefits. (R. 9–23.) On October 15, 1993, claimant filed a request for reconsideration and on December 3, 1993, the Appeals Council denied the request and affirmed the decision of ALJ DiCenzo. (R. 6–8, 4–5.) Therefore, the decision of the ALJ now stands as the final decision of the Secretary. On December 13, 1993, claimant filed the instant action for review of the Secretary's decision. On April 15, 1994, claimant filed a motion for summary judgment and on May 13, 1994, the Secretary filed her motion for summary judgment.

## II. *Facts*

Claimant was born on October 2, 1948, making her 42 years old as of the date of the first administrative hearing and 44 as of the second administrative hearing. (R. 34.) She has a tenth grade education with a GED. (R. 35.) She has no history of past work. (R. 35.)

On September 1, 1989, Milton D. Bosse, M.D. stated that he had first seen claimant in November 1975 and last in August 1989. (R. 180–89.) Claimant was diabetic and took Micronase for this condition. (R. 181.) On September 20, 1989, he also stated that claimant had no history of psychiatric impairment or treatment, was able to ask pertinent questions and related appropriately to the doctor. (R. 190.) She had not shown overt psychotic or neurotic behavior, memory loss or any confusion while in his office; there was also no evidence of diabetic retinopathy, history of acidosis or neuropathy. (R. 190.)

Between April 20 and April 24, 1990, claimant was hospitalized for chest pain diagnosed as alcoholic gastritis, alcoholism and diabetes. (R. 191–214.) Serial enzymes and EKGs demonstrated no myocardial damage; telemetry showed stable rhythm. (R. 192.) An endoscopy was performed which demonstrated severe gastritis, which was treated with Zantac, and her blood sugar was stabilized with Micronase. (R. 192.) She was also prescribed Nitroglycerin. (R. 193.) A May 1, 1990 treadmill test was negative for ischemia, angina pectoris and chest pain. (R. 215–24.) Claimant visited the Forbes Health System on various occasions between February 1987 and June 1990. (R. 225–41.) A June 30, 1989 chest x-ray was normal, and an upper GI examination in February 1987 showed a small hiatal hernia and no gastroesophogeal reflux with normal gallbladder. (R. 232, 240–41.)

Claimant was hospitalized between June 23 and July 1, 1990 for chest pain, but the diagnosis was gastritis brought on by resumption of alcohol. (R. 242–62.) Serial EKGs and enzymes showed no evidence of myocardial infarction. (R. 242.) A sonogram of the upper right quadrant and an IVP were normal. A urinary tract infection was treated. She was started on insulin, and

Dr. Castiglione indicated that the key to outpatient treatment was weight loss and compliance with a good diet. (R. 243.)

On September 25, 1990, Dr. Bosse stated that diabetes could be better controlled if claimant followed the prescribed diet. (R. 263–71.) There was no evidence of any end organ damage. (R. 270.) Claimant did smoke which caused some chronic obstructive pulmonary disease, but the lungs were clear on examination. (R. 270.) She had not been referred to a mental health facility. Appearance and hygiene were good, she related appropriately to Dr. Bosse and his staff, she was able to care for personal needs independently, there was no evidence of dementia or psychotic behavior, and she could understand directions for the use of medications. (R. 270–71.) On October 1, 1990, a report of contact with the Pittsburgh Cardiovascular Institute indicated that claimant was seen be Dr. Caminos on May 1, 1990 for a stress test, which was negative for ischemia, angina, arrhythmia, or chest pain; there was good aerobic function. (R. 272.)

On November 9, 1990, Dr. Bosse stated that he had seen claimant on October 23, 1990. (R. 273–83.) He said that he prescribed Valium on occasion for nerves and that claimant had shortness of breath accompanied by wheezing. (R. 276–77, 274.) On January 23, 1991, Dr. Bosse stated that claimant had complained of intermittent nervous tension, and complained of shortness of breath when seen in October. She had a history of diabetes. (R. 285.)

On September 17, 1992, Jose B. Caballe, M.D. conducted a consultative examination. (R. 299–301.) Claimant reported that she had quit drinking and smoking. (R. 300.) Examination revealed no abnormal findings; the lungs were clear, there were no wheezes, pulmonary status appeared to be stable and there was no evidence of bronchospasm. (R. 300–01.) Claimant stated that she could walk the entire length of a shopping mall before having to rest. His impression was diabetes treated with insulin, history of bronchial asthma and chronic bronchitis, history of chest pain and gastritis, and obesity. (R. 301.)

On October 12, 1992, Dr. Caballe estimated that claimant was able to lift and carry up to ten pounds occasionally, stand and walk three hours a day. (R. 303.) She was limited in pushing and pulling by shortness of breath, but could balance frequently, climb, stoop, crouch, kneel and crawl occasionally. (R. 304.) She had environmental limitations of temperature extremes, dust, fumes and humidity, but no limitations in the ability to reach, handle, feel, see, hear or speak. (R. 304.) On May 10, 1993, Dr. Bosse stated that because he had seen claimant only irregularly, he could express no opinion on her disability. (R. 332.)

On August 4, 1993, Frank Meacci, Jr., Ph.D. interviewed claimant at the request of her attorney and administered the Minnesota Multiphasic Personality Inventory (MMPI). (R. 340–45.) Claimant stated that she heard and saw a brother who had died of diabetes, had feelings of hopelessness about her physical condition, and had episodes of irritability with her adult children. (R. 341.) Dr. Meacci stated that the test results, combined with the interview information, indicated a "mentally disordered" condition; he classified it as major depression, recurrent, with psychotic features. (R. 343.) Claimant reported the following symptoms: shortness of breath when she walked up ten steps, fatigue if she walked over two to three blocks, sleep disturbance in one-hour intervals, disruption of her daily diet which resulted in the loss of twenty pounds in two months, feelings of hopelessness and helplessness that her condition would ever improve, episodes of agitation and irritability usually focused on the children, isolation and withdrawal, flat affect, episodes of crying, auditory and visual hallucinations relating to a brother who had died of diabetes years before. (R. 343.) He indicated that she had a present Global Assessment of Functioning (GAF) of 25, and that her highest GAF in the past year had been 35. (R. 343.)

At the hearing, claimant stated that she takes Apent for asthma, Zantac for an ulcer, Valium for nerves and insulin for diabetes. (R. 54, 56–57, 54.) She has crying spells and gets irritable (R. 58–59), and she has feelings of hopelessness about her condition and occa-

sionally has dreams about her deceased brother. (R. 59.) She has trouble sleeping and has to rest during the day. (R. 60.) She lives with her son in an apartment, takes care of her home, cooks, cleans (but relies upon her son for help), shops, handles her own money, plays bingo several times a month, visits family and friends during the week, bowls once a month, and attends church. (R. 56–66, 120, 125, 131.) She does not attend a mental health clinic. (R. 68.)

Samuel E. Edelmann, M.Ed., a vocational expert (R. 336–38), testified that, assuming that an individual of claimant's age, education and lack of work experience could perform light work in an environment free of temperature extremes, chemical fumes, dust and humidity, there were numerous jobs that such an individual would be qualified to perform, such as small parts assembler, security guard, and clerical worker. (R. 69–74.) Assuming further that there were periods of depression from time to time over a year with intact memory and judgment average concentration, the expert stated that this condition would not preclude the jobs identified. (R. 74.) If her GAF was 35, he thought that she would not be able to work. (R. 72.)

After considering the testimony of the claimant and the vocational expert and the medical evidence presented at the hearing, the ALJ made the following pertinent findings:

2. The medical evidence establishes that the claimant suffers from diabetes, controlled, gastritis, small hiatal hernia, chronic obstructive pulmonary disease, "history of alcohol abuse, history of chest pain, uncertain etiology, obesity, and major depression, recurrent. However, she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. Considering the claimant's allegations of disability under the criteria set out in Social Security Ruling 88–13, these are not of the frequency or duration as to prevent the claimant from functioning vocationally.

4. The claimant retains the residual functional capacity to perform work of light exertion in work not involving working in polluted atmospheres, extreme temperatures or in high humidity.

8. Based on an exertional capacity for light work as herein described, and considering the claimant's age, education and lack of work experience, Vocational Rule 202.20 directs a conclusion of "not disabled".

9. Although the claimant's additional non-exertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which claimant can perform. Examples of such jobs are: small parts assembler, unarmed security guard, and a wide range of clerical jobs.

10. The claimant was not under a "disability" as defined in the Social Security Act at any time on or before the date of this decision (20 CFR 416.920(f)).

III. *Discussion*

 The standard of judicial review is whether the Secretary's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir.1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427; *Smith v. Califano,* 637 F.2d at 970; *Dobrowolsky v. Califano,* 606 F.2d 403, 406 (3d Cir.1979). If supported by substantial evidence, the Secretary's decision must be affirmed.

 The Supreme Court has described a five-part test established by the Secretary to determine whether a person is disabled:

The first two steps involve threshold determinations that the claimant is not presently working, and has an impairment which is of the required duration and which sig-

nificantly limits his ability to work. *See* 20 C.F.R. §§ 416.920(a) through (c) (1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. *See* 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

*Sullivan v. Zebley,* 493 U.S. 521, 525, 110 S.Ct. 885, 889, 107 L.Ed.2d 967 (1990). Whereas the initial burden rests with claimant to demonstrate that she was unable to engage in her past work, 42 U.S.C. §§ 416(i), 423(d)(1)(A), the ALJ's finding that claimant has satisfied that burden means that the burden then shifts to the Secretary to show that other work existed in the national economy. *Green v. Schweiker,* 749 F.2d 1066, 1071 (3d Cir.1984). The fifth step is divided into two parts:

> First, the Secretary must assess each claimant's present job qualifications. The regulations direct the Secretary to consider the factors Congress has identified as relevant: physical ability, age, education, and work experience. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f) (1982). Second, she must consider whether jobs exist in the national economy that a person having a claimant's qualifications could perform. 20 C.F.R. §§ 404.1520(f), 404.1566–404.1569 (1982).

*Heckler v. Campbell,* 461 U.S. 458, 460–61, 103 S.Ct. 1952, 1954–55, 76 L.Ed.2d 66 (1983) (footnotes omitted).

Claimant challenges the ALJ's decision the ground that the ALJ improperly ignored the testimony of Dr. Meacci, a clinical psychologist, because it was obtained at the request of claimant's attorney and because claimant's treating physician (Dr. Bosse) had noticed no psychological problems. Claimant alleges error specifically because the ALJ previously had refused counsel's request for a psychological examination of claimant and because Dr. Meacci's testimony is uncontradicted by any other evidence in the record.

■ The Secretary asserts that: 1. the ALJ properly used the medical-vocational guidelines ("grids") as a framework for determining claimant's capabilities given her physical disabilities; 2. the ALJ could properly prefer the opinion of claimant's treating physician over that of a practitioner such as a psychologist; 3. a psychological problem is not disabling in and of itself unless accompanied by functional limitations that render an individual unable to work and no such limitations were demonstrated on the record (her activities suggest otherwise and she has never been under treatment for a mental impairment); 4. alcohol abuse is not disabling unless the individual demonstrates loss of control and a related functional loss not presented here; 5. the vocational expert testified that, even considering periods of depression, jobs still existed in the national economy that claimant could perform; and 6. claimant is young, a positive factor. Upon review, the Court should find that the ALJ has failed to support his findings with substantial evidence in several respects.

### Preferring Dr. Bosse's Testimony Over Dr. Meacci's

■ The Secretary asserts that the ALJ could correctly give more weight to the opinion of a medical doctor than to that of a practitioner such as a psychologist. However, the Court cannot agree with the Secretary's position on this matter. Neither citation presented by the Secretary offers any support for this point of view: 20 C.F.R. § 416.913(a)(3) states that medical evidence can include that of a licensed or certified psychologist and *Lee v. Sullivan,* 945 F.2d 687, 691 (4th Cir.1991) highlights the regulation that a *chiropractor's* opinion does not

qualify as an "acceptable medical source." [1] As just indicated, the testimony of a clinical psychologist (such as Dr. Meacci) does constitute an acceptable medical source. Moreover:

> It should be noted that physicians, with the exception of those specializing in psychiatry . . . are totally unqualified to diagnose psychological disorders. Were the orthopaedic surgeons who reported to the ALJ to diagnose malingering and rule out conversion disorder, they would be practicing psychology without a license.

*Lingo v. Secretary of Health and Human Servs.*, 658 F.Supp. 345, 351 (N.D.Ohio 1986). *See also Caldwell v. Sullivan*, 736 F.Supp. 1076, 1082 (D.Kan.1990); *Brown v. Bowen*, 682 F.Supp. 858, 861–62 (W.D.Va.1988). Thus, it would appear that the Secretary has it backwards: it was incumbent upon the ALJ to articulate how other evidence from qualified individuals permitted him to reject the opinion of Dr. Meacci, an acceptable source of information about claimant's mental impairments.

### Rejection of MMPI Results

■ The Secretary admits that the MMPI administered by Dr. Meacci led him to conclude that claimant suffered from major depression with psychotic features. However, neither the Secretary nor the ALJ separated the findings of the MMPI from Dr. Meacci's opinion of claimant's condition. Specifically, the MMPI revealed that:

> The validity configuration of the Minnesota Multiphasic Personality Inventory of F − K = 0, was indicative of a valid profile, suggestive of an unusual response set. The client was both admitting to significant social emotional problems and trying to appear well adjusted. However, the pattern responses supported the presence of an acute disturbance, with other intact defenses. On the other hand, these results may describe an individual with a severe disturbance, attempting to be defensive unsuccessfully. The balance between open expression of problems and defensive control becomes erratic and unpredictable. (R. 342.)

The report of a "valid profile" is significant in that:

> It is common knowledge that the MMPI has an elaborate built-in mechanism to detect malingering. The fact that the validity profile suggested openness indicates that [the claimant] was not "faking" her response. Had she attempted to do so, the validity scales would have pointed out the test's invalidity for this administration.

*Lingo*, 658 F.Supp. at 351. *See also Bryant v. Bowen*, 882 F.2d 1331, 1334 (8th Cir.1989) (error for ALJ to reject mental impairment substantiated by MMPI when it was the only evidence on this issue). ALJ DiCenzo failed to indicate any basis for rejecting the results of the MMPI, an evaluative test with a built-in mechanism to detect whether a claimant is faking. Indeed, in his questioning of the vocational expert, the ALJ asked if an MMPI might not have had more significance than a GAF evaluation, suggesting that he was unaware that Dr. Meacci had tested claimant with an MMPI. (R. 73.) Therefore, the MMPI stands as uncontradicted evidence of claimant's psychological condition.

### Other Functional Limitations

"The Secretary has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments." *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir.1992) (citing 20 C.F.R. § 404.1520a). The regulations require that the ALJ complete an OHA Psychiatric Review Technique Form and attach it to his decision. 20 C.F.R. § 404.1520a(d). In this instance, ALJ DiCenzo completed the form and checked box 12.04 for Affective Disorders. He then indicated more specifically 12.04(A)(1) "Depressive Syndrome characterized by at least four of the following", but then checked only three boxes: "Sleep disturbance", "Decreased energy" and "Difficulty concentrating or thinking." Thus, claimant would appear not to have sufficient factors to warrant a finding of a depressive affective disorder. Nevertheless, other factors, such as hallucinations,

---

**1.** *See* 20 C.F.R. § 416.913(e)(3).

were documented by Dr. Meacci and not indicated by ALJ.

Similarly, the regulations require that an individual have at least two of the following: *marked* restriction of activities of daily living; *marked* difficulties in maintaining social functioning; *repeated* episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B). The ALJ noted only moderate restrictions, moderate difficulties and once/twice (rather than repeated) episodes, which would indicate that claimant's condition is not disabling. However, Dr. Meacci's report indicated that claimant suffers from "a persistent inability to concentrate and accomplish work-like tasks" and that she "tends to withdraw and isolate herself, and then eventually disassociate from others." These findings could satisfy two of the factors in the regulations, yet ALJ DiCenzo offered no explanation of why he rejected Dr. Meacci's conclusions. Moreover:

> A claimant with ratings of "moderate" in the first and second areas, "often" in the third area, and "once/never" in the fourth area has neither a presumptively non-severe impairment nor a presumptively disabling impairment. These in-between ratings result in findings of mental disorders which do not meet the paragraph B criteria but which are nonetheless disabling within the meaning of the regulations.

*Pratt,* 956 F.2d at 835 n. 12. Thus, even pursuant to the Secretary's own regulations, the ALJ's findings suggest that claimant may be disabled under these circumstances.

### Testimony of the Vocational Expert

ALJ DiCenzo relied upon the opinion of the vocational expert, Samuel E. Edelmann, to hold that, for an individual of claimant's age, education and lack of work experience who could perform light work in an environment free of temperature extremes, chemical fumes, dust and humidity, there were numerous jobs that such an individual would be qualified to perform, such as small parts assembler, security guard, and clerical worker. Assuming further that there were periods of depression from time to time over a year with intact memory and judgment average concentration, Mr. Edelmann stated that this condition would not preclude the jobs identified.

However, Mr. Edelmann also testified that, if claimant's GAF was 35, he thought that she would not be able to work. As discussed *supra,* the ALJ offered no contrary evidence from qualified individuals upon which he could base his rejection of Dr. Meacci's determination that claimant's GAF was indeed 35 and therefore, the hypothetical posed to him containing the GAF limitation was an accurate one upon which the ALJ's decision should have been founded. *See Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).

For all of the reasons identified *supra,* the Court should remand this action to the Secretary for further consideration of claimant's possible psychological impairments. If the Secretary wishes to conduct another psychological evaluation of claimant to contrast with that of Dr. Meacci, then the ALJ would have alternative evidence upon which to rely.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this report and recommendation are due by September 26, 1994. Responses to objections are due by October 11, 1994.

September 8, 1994.

Dated.