**Babe Doris CALDWELL, Plaintiff,**

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 88–1256–T.**

United States District Court, D. Kansas.

April 26, 1990.

David H.M. Gray, Wichita, Kan., for plaintiff.

Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the Secretary's motion to affirm and the plaintiff's motion for summary judgment. This action involves two applications made under the Social Security Act. Plaintiff filed an application for disability insurance benefits under Title II of the Act, 42 U.S.C. § 401 *et seq.* and an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* Plaintiff's applications were denied initially (Tr. 91–98) and on reconsideration. Tr. 107–15. On October 30, 1987, following a hearing, an administrative law judge (ALJ) rendered a decision finding that plaintiff was not under a disability as defined in the Social Security Act. Tr. 15–23. On March 7, 1988, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Tr. 3–4. Thus, the decision of the ALJ stands as the final decision of the Secretary. Judicial review is available under 42 U.S.C. §§ 405(g), 1383(c)(3).

The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, ..." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). It is not the duty of the court to reweigh the evidence. *Garrett v. Califano,* 460 F.Supp. 888, 890 (D.Kan.1978); *Manigan v. Califano,* 453 F.Supp. 1080, 1086 (D.Kan.1978). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. at 1428. This court cannot affirm the Secretary's decision by isolating a few facts and calling them "substantial evidence." *Cline v. Califano,* No. 78–4166 (D.Kan., August 31, 1979). It is the court's duty to scrutinize the entire record to de-

termine whether the Secretary's conclusions are rational. *Keef v. Weinberger,* 404 F.Supp. 1193, 1196 (D.Kan.1975). In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

In a Title II application filed on January 22, 1987, plaintiff alleged disability beginning January 28, 1983, as a result of diabetes, fatigue, arthritis in her hands, and bad feet. Tr. 69–72. The Title XVI application does not appear in the record. Plaintiff died on June 23, 1988, shortly after this action was filed. Her children have been substituted as plaintiffs. In this opinion, the court will refer to the original claimant, Babe Doris Caldwell, as plaintiff.

E.R. Schlachter, M.D., admitted plaintiff to St. Francis Hospital on February 20, 1983, for regulation of her diabetes, treatment of high blood pressure, and treatment of a mass in her breast. Tr. 125. Chest x-rays taken on February 23, 1983, revealed a "minimally enlarged" heart and an EKG revealed some abnormalities. Tr. 131–32. Lamont Bloom, M.D., began treating plaintiff's diabetes with insulin during her hospitalization. Tr. 175. Dr. Schlachter's diagnosis was left breast mass abscess, essential hypertension, diabetes mellitus, and hypokalemia. Tr. 125.

When Lewis A. Smith, O.D., examined plaintiff on February 30, 1984, her vision could be corrected to 20/25 + on the right and 20/20 on the left for distance vision, and 20/25 − on the right and 20/25 on the left for near vision. Visual fields were normal and her eyes appeared healthy. Dr. Smith found no indication of visual disability at the time of the examination. Tr. 142–43.

From January 29, 1986 through February 3, 1986, plaintiff was hospitalized because of uncontrolled diabetes. Tr. 139. The admission physical revealed mild background diabetic retinopathy and obesity. Tr. 141. Dr. Bloom indicated that plaintiff's admitted noncompliance with diet and medication contributed to the difficulty in controlling her condition. Dr. Bloom increased plaintiff's insulin dosage and her "blood sugars came into good control." Tr. 139–40.

In a report dated February 4, 1987, Dr. Bloom indicated that when he saw plaintiff on December 19, 1986, she complained of arthritis in her arms and shoulders but had not been taking Motrin as prescribed. He further indicated that plaintiff had "insulin requiring diabetes mellitus and not insulin dependent." He concluded that plaintiff's blood sugars were usually under very good control if she complied with diet, exercise, and activity. Dr. Bloom had no evidence of disability from the standpoint of her diabetes or arthritis. Tr. 145.

Daniel A. Shea, O.D., examined plaintiff's eyes on March 23, 1987. Ophthalmoscopic examination revealed no diabetic retinopathy. Although plaintiff did not exhibit glaucoma, the doctor recommended frequent examinations because of increased risk of glaucoma due to diabetes and ocular hypertension. Tr. 146.

Office notes from Dr. Bloom cover plaintiff's treatment from approximately March 1983 through August 1987. Tr. 151–69. During the course of treatment, Dr. Bloom made a number of notes about plaintiff's failure to take insulin as prescribed (Tr. 153, 164) and failure to follow the prescribed diabetic diet. Tr. 152, 154, 157, 159, 160, 162, 164, 167, 168. Dr. Bloom commented that when plaintiff complied with prescribed treatment her condition was much better. Tr. 156, 157, 158.

Plaintiff underwent a psychological evaluation by Kerin L. Schell, Ph.D., during September 1987. Tr. 176–236. Psychological testing included the Wechsler Adult Intelligence Scale–Revised (WAIS–R), which revealed a verbal IQ of 82, a performance IQ of 87, and a full scale IQ of 83 (Tr. 184); the Luria–Nebraska Neuropsychological Battery, which indicated that plaintiff suffered brain damage, resulting in difficulty thinking, memory problems, and hand coordination deficits (Tr. 185); and the Minnesota Multiphasic Personality Inventory (MMPI), which suggested that plaintiff exhibited hysterical and hypochon-

driacal tendencies, in addition to suggesting the possibility of neurological problems. Tr. 185–86.

Dr. Schell stated that the results on the Luria test corroborated the plaintiff's actual deficits, lending validity to the test results. Dr. Schell stated that the test results from the MMPI were valid. Plaintiff completed the test carefully and relevantly. There were no indications on the MMPI of "faking bad." Dr. Schell opined that plaintiff appeared to have answered the questions carefully and truthfully. Tr. 185. An optional research scale of the MMPI suggested the possibility of exaggerating psychopathology. Dr. Schell found this not to be unexpected in an individual with brain damage who had regressed into previously latent hysterical tendencies. Dr. Schell believed plaintiff was denying more pathology than what little she may have been exaggerating. Tr. 185.

Dr. Schell's primary diagnosis was organic personality syndrome. Depression and anxiety were a part of this syndrome. The plaintiff's depression symptoms included depressed mood, loss of interest and pleasure, psychomotor retardation, fatigue, loss of energy, feelings of worthlessness, diminished ability to think or concentrate, and indecisiveness. Her anxiety symptoms included motor tension; aches, soreness, and easy fatigability; autonomic hyperactivity; shortness of breath, accelerated heart rate, sweating, dizziness and lightheadedness, nausea, abdominal pain; vigilance and scanning; exaggerated startle response, difficulty concentrating, and irritability. Tr. 188–89.

Dr. Schell stated that plaintiff's problems in tolerating pain were partially due to her existing medical disorders, partially stress-induced (psychological factors affecting physical condition; somatoform disorders), and partially due to brain damage. Tr. 189. Plaintiff's symptoms of psychological factors affecting physical condition included her gradual physical deterioration during the previous two years. Symptoms of conversion disorder included coordination disturbance, paresthesia, and vomiting. Symptoms of somatization disorder included pseudoneurologic symptoms, gastrointestinal discomfort, female reproductive difficulties, psychosexual problems, and cardiopulmonary symptoms. Tr. 189. Symptoms relating to avoidant personality included being easily hurt by criticism, avoidance of people and social contact, fear of saying something inappropriate, fear of being embarrassed, and exaggeration of difficulties. Tr. 191.

Kermit E. White, M.D., a psychiatrist, evaluated plaintiff; however, the date of this evaluation is not reflected in the record. The doctor stated in a report dated January 4, 1988 that plaintiff reported symptoms associated with organic brain syndrome, such as memory loss, thinking and concentration difficulties, apathy, weakness, fatigue, and other psychometric impairments. Dr. White concluded that the plaintiff demonstrated "organic impairment on her psychometric tests and a diagnosis of organic brain syndrome secondary to hypertension induced cerebral arteriosclerosis should be entertained." Dr. White's conclusions were based on the combination of hypertension, diabetes, and chronic obstructive pulmonary disease, which could impair brain functioning and contribute to the inability to think clearly, act responsibly, or function with adequate judgment. Tr. 11–12.

At a hearing held on September 23, 1987, plaintiff testified that she was 62 years old and had completed the 12th grade. She last worked in January or February 1983 as a general office worker. Her job duties involved answering the phone, preparing and sending billing statements, and typing. Tr. 35–37, 86. Other former jobs included supervisor of maintenance at a hospital and owner of a day care center. Tr. 37–38, 87–88.

Plaintiff reported suffering diabetes, which made her tired and had an effect on her visual acuity. Tr. 38–39, 52. She alleged having arthritis pain for more than ten years, Tr. 49, which could affect her wrists, hands, elbows, shoulders, knees, ankles, hips, or back. Tr. 37, 41–42. She stated that her knees had hurt for more than 20 years, but believed that they had

gotten worse in the previous three or four years. Tr. 58–59. She took Motrin for pain relief. Tr. 48. Moderate activity caused shortness of breath, Tr. 40–41, but plaintiff admitted to smoking cigarettes. Tr. 49. She testified that she got depressed and was easily upset. She had taken medication for her depression in the past but was not taking this medication at the time of the hearing. Tr. 45, 51–52.

Plaintiff believed that she could walk one block slowly, stand 20 to 30 minutes with proper shoes, sit for one hour before her feet would go to sleep and she would become stiff, and lift a 10 pound bag of potatoes with both hands and carry it from the car to her house. Tr. 42–44. Daily activities included caring for two grandchildren, ages 10 and 12, who lived with her, and a 9 year old grandchild who stayed with her occasionally. She cooked, did laundry, drove a little, attended church occasionally, changed beds with the help of a grandchild, went grocery shopping, ate out occasionally, played bingo, and did some reading. Her grandson vacuumed and took out the trash. Tr. 53–55. The household income consisted of $312 per month from Aid to Families with Dependent Children (AFDC) and $119 per month in food stamps. Medicaid covered some of plaintiff's medical bills. Tr. 57–58.

Marvin Lynch, plaintiff's brother, testified and generally corroborated plaintiff's testimony. He stated that he had observed plaintiff having difficulty walking, lifting, and seeing, and had heard her complain of pain in her back and hands. He believed that she had a poor memory and that she became upset easily. Tr. 59–65.

For determining whether a Social Security claimant is disabled, the Secretary has developed a five step sequential evaluation. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.1988). If the claimant fails at any of the steps where he or she bears the burden of proof (steps one through four), consideration of any subsequent steps is unnecessary.

The relevant inquiry at step one is whether the claimant is engaged in substantial gainful activity. If not, step two requires the factfinder to determine whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). Step three entails determining "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.* If no equivalency, the claimant must show at step four that the "impairment prevents the claimant from performing work he has performed in the past." *Id.* At the fifth step, the factfinder must determine whether the claimant has the residual functional capacity "to perform other work in the national economy in view of his age, education, and work experience." *Id.* The Secretary bears the burden of proof at step five. *Id.*, 107 S.Ct. at 2294 n. 5; *Williams*, 844 F.2d at 751.

The issue before the court is whether the final decision of the Secretary is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g).

The ALJ found at step one of the sequential evaluation process that the plaintiff was not engaged in substantial gainful activity. Tr. 18–19. At steps two and three, the ALJ determined that plaintiff had only one severe medically determinable physical impairment—diabetes—which was not of listing severity. Tr. 19. The ALJ rejected plaintiff's complaints of mental or emotional impairments. The ALJ noted that plaintiff had had no psychiatric hospitalizations and no psychotherapy or other treatment for emotional problems. Plaintiff's treating physician never indicated in his notes that plaintiff suffered from any mental status abnormalities. The ALJ noted that the plaintiff demonstrated no memory or concentration problems during the hearing— that she was able to relate her medical, vocational, and social history without difficulty. Tr. 19.

The ALJ rejected Dr. Schell's psychological evaluation. The ALJ found Dr. Schell's conclusions to have little probative value since they were not rendered by a treating physician and were reached after only lim-

ited contact with the plaintiff over the course of a few days. The ALJ found that the results of the tests administered to the plaintiff did not support her allegations of memory or concentration limitations. Plaintiff's I.Q. scores placed her in the low-normal range of measured intelligence. The ALJ criticized Dr. Schell's conclusion that brain damage was present since there was not reference point from which to determine plaintiff's functioning in earlier years. Tr. 20.

The ALJ also criticized Dr. Schell for not considering the fact that the test results were completely under the plaintiff's control and that plaintiff was aware these results would be used in supporting her claim for disability benefits. The ALJ rejected the clinical scales which indicated brain damage in the areas of tactile functions, motor functions, simple hand movements, and simple calculations. The ALJ found these results to be "completely inconsistent with the claimant's independent life style and her ability to take care of three active grandchildren." Tr. 20.

The ALJ found at step four that the plaintiff could perform work she has performed in the past and that she was not, therefore, disabled. Tr. 21. The ALJ found that plaintiff's diabetic and arthritic problems could prevent heavy lifting and bending, but did not impose limitations on plaintiff's ability to sit, stand, and walk, lift light objects, and perform gross and fine manipulations with her hands. Tr. 20. The ALJ found that the plaintiff had no mental or emotional impairments. Tr. 20–21. Plaintiff's prior work as a secretary and general office worker fell within the sedentary to very light category of work. The ALJ concluded that plaintiff retained the exertional and nonexertional capacity to perform her prior work as a secretary and office employee. Tr. 21.

With respect to all of plaintiff's complaints except that of pain, the ALJ found them "totally exaggerated and lacking in credibility." Tr. 21. The ALJ found plaintiff's complaints of pain credible to the extend that plaintiff was probably unable to engage in strenuous physical activity.

The ALJ stated that he did not rely primarily or solely on the objective medical evidence of record; however, he noted the scarcity of evidence of recent medical treatment. Finally, the ALJ called the plaintiff's credibility and motivation into question based on the elements of secondary gain in the case. Plaintiff's average wages from 1978 through 1982 were only $5500.00 per year. In years prior to 1978, plaintiff's earnings were less than $2000.00 per year or she had no earnings at all. The ALJ concluded that since plaintiff's income, in the form of Aid to Families with Dependent Children and food stamps, exceeded her take-home pay in most years in which she had been employed, the plaintiff had little to gain from an economic standpoint from returning to work. Tr. 21–22.

■ Several issues are presented in this matter. The first issue is whether the ALJ properly found the plaintiff's complaints to be incredible. The determination of credibility is left to the ALJ as the finder of fact and that determination is generally binding on the reviewing court. *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir.1983). When the ALJ finds the plaintiff incredible, he must make specific findings and state his reasons for disbelief. *Claassen v. Heckler*, 600 F.Supp. 1507, 1511 (D.Kan. 1985).

■ On the issue of plaintiff's credibility, the ALJ demonstrated a shocking distrust of the plaintiff and her motivations. Apparently, because the plaintiff was not a wealthy woman, her credibility was subject to a high level of scrutiny. The ALJ, in essence, accused the plaintiff of being lazy and interested only in receiving the maximum public assistance benefits possible. This attitude is not only extremely distasteful, but it is legally insupportable. An ALJ is required to be fair and impartial, not prejudiced against a claimant because of the claimant's financial status. *See* 20 C.F.R. § 404.940 ("An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision.").

Additionally, the ALJ's credibility determination is not supported by substantial evidence. The hearing in this case was held on September 23, 1987. Tr. 32. Plaintiff testified that two grandchildren lived with her full time. Plaintiff's ten year old grandson had always lived with her. Her twelve year old granddaughter had lived with her since May or June 1987, since school was out. Tr. 53–54, 56. She had been receiving AFDC for one grandchild since July 1987. She received no assistance for the other grandchild. Tr. 57–58. The conclusion reached by the ALJ—that the plaintiff had no financial incentive to return to work—is not supported by the evidence. Plaintiff last worked in early 1983, Tr. 35, but did not receive AFDC benefits until mid–1987. For over four years, the plaintiff would have had an incentive to return to work. The ALJ's credibility determination thus lacks factual support.

The same distrust that the ALJ evidenced toward plaintiff was also apparent in his consideration of Dr. Schell's opinions. The ALJ erroneously stated that Dr. Schell did not consider the fact that the test results were under the plaintiff's control and that the plaintiff was aware that the test results would be used to support her claim for benefits. Tr. 20. Dr. Schell did, however, consider this issue several times in his lengthy (61 page) report and found no evidence of inconsistencies or unusual response patterns in the test results to indicate that the plaintiff attempted to falsify test responses or distort information (*i.e.*, no "faking bad"). *See* Tr. 184, 185, 192–93, 217–18, 221 (interpretation of MMPI by Lawrence R. Weathers, Ph.D.), 226.

■ The ALJ cited the lack of psychiatric hospitalization, psychotherapy, or other treatment for emotional problems as evidence that plaintiff did not suffer any mental impairments. The ALJ also relied on the fact that plaintiff's treating physician, Dr. Bloom, made no indication in his notes of mental impairments. Tr. 19. Neither of these cited reasons support the ALJ's decision. A person suffering from mental difficulties may be unable to recognize the need to seek treatment. The fact that a claimant's problems were not diagnosed sooner is often because the claimant was unaware of the cause of her difficulties. *See Morrison v. Bowen*, No. 83–6001 (D.Kan., Sept. 14, 1987); *O'Farrell v. Secretary*, No. 84–1436 (D.Kan., April 9, 1985). The fact that a treating physician failed to note any mental problems does not contradict the findings of a psychiatrist or psychologist. *See Taylor v. Bowen*, No. 86–1378 (D.Kan., May 19, 1987).

The ALJ stated that plaintiff's test results did not support plaintiff's claims of memory or concentration limitations. The ALJ relied on plaintiff's I.Q. scores on the Wechsler Adult Intelligence Scale, which placed her in the dull/normal range of measured intelligence. Tr. 20, 184. The ALJ also criticized Dr. Schell's conclusion of brain damage since there was no reference point from which to determine plaintiff's functioning in earlier years. Tr. 20. The ALJ failed to consider that such "early" test results are rarely available because prior to the onset of problems, the patient would have no reason to submit to such testing.

■ The ALJ noted that plaintiff demonstrated no memory or concentration problems at the hearing and that she was able to testify regarding her medical, social, and work history without difficulty. Tr. 19. The court agrees with plaintiff that this is the psychological equivalent of the "sit and squirm" test. The ALJ's observation also ignores the fact that the plaintiff would have prepared for the hearing with her attorney.

The court holds that the ALJ's finding that plaintiff was not disabled is not supported by substantial evidence. In light of the significant evidence in the record attesting to plaintiff's disability as a result of brain damage, and the lack of evidence to support the ALJ's conclusions, the court finds that no useful purpose would be served by remanding the case for further consideration. The only reasonable conclusion to be drawn from the record is that plaintiff was completely disabled and entitled to benefits. No purpose would be

served by remand other than to delay the receipt of benefits to which plaintiff was entitled and to which plaintiff's estate is entitled.

IT IS BY THE COURT THEREFORE ORDERED that the Secretary's motion to affirm is hereby denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is hereby granted. This matter is remanded to the Secretary with instructions to award benefits pursuant to the plaintiff's application.