**Katherine M. O'CONNOR, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 93–4199–DES.**

United States District Court,
D. Kansas.

Jan. 26, 1995.

Stephen J. Ternes, Legal Aid Soc. of Topeka, Inc., Topeka, KS, for plaintiff.

Melanie D. Caro, Office of U.S. Atty., Topeka, KS, for defendant.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. INTRODUCTION

This matter is before the court on plaintiff's motion to reverse the decision of the Secretary of Health and Human Services ("Secretary") (Doc. 7) and the Secretary's motion to affirm (Doc. 10).

The court has reviewed the entire record, as well as the parties' memoranda and the relevant law, and is ready to rule.

## II. PROCEDURAL BACKGROUND

On December 17, 1990, plaintiff filed an application for supplemental social security benefits under Title XVI of the Social Security Act. Her application was denied initially and on reconsideration. On March 14, 1991, she filed a request for hearing. Administrative Law Judge ("ALJ") Thomas W. Stout heard her case August 21, 1991. ALJ Stout denied plaintiff's request for supplemental benefits June 26, 1992. On July 23, 1992, plaintiff appealed the denial to the Appeals Council. The Appeals Council denied her claim July 13, 1993. The Appeals Council's decision stands as the final decision of the Secretary.

## III. FACTUAL BACKGROUND

█ The court has the duty to scrutinize the entire record. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). The record is extensive. For purposes of clarity, the relevant facts are separated into the following three general categories: (1) personal history; (2) medical history; and (3) vocational history.

### A. Personal History

Plaintiff was born June 17, 1958, in Portland, Oregon. She stands 5'7", weighs between 95 and 110 lbs, and is right handed. She is married and has two dependent children. Her husband works as a cook at the Plaza III grill in Topeka, Kansas. Both she and her husband are active in their church. On most Wednesdays they participate in temple preparation classes and every Tuesday night they help with a cub scout pack organized through their church.

Plaintiff's parents live across the street from her. She visits them daily and rides in the car with them whenever they go anywhere. She also visits friends from church several times a week. However, the great majority of her time is spent watching televi-

sion. She estimates she watches television 15 hours every day. When not watching television, she helps her husband and daughters perform various tasks around the house. For example, she is able to sort and fold laundry, help with the cooking and grocery shopping, and vacuum for five minutes without resting. In the summer, she works in her garden 25 minutes every day. She enjoys cake decorating, playing baseball, and swimming, but a shoulder injury makes it difficult for her to move her arms.

Plaintiff has a driver's license, but drives infrequently. Her husband drives when the family goes anywhere in the car. Occasionally, they take trips to visit relatives in Leroy, Kansas, which is 100 miles from her home. During their trips to Leroy, they must stop four times because plaintiff has to urinate. Plaintiff estimated she must urinate every 15 to 20 minutes. Because of her need to urinate frequently, she is unable to sleep through the night.

Although plaintiff completed the tenth grade, she reads and spells at a third grade level and her mathematics comprehension is equivalent to that of a beginning fourth grader. Her Wechsler Adult Intelligence Scale Revised (WAIS–R) Full Scale I.Q. is 79, which is borderline mentally retarded. She has a history of learning disability. When she reads, she often skips words resulting in poor comprehension. She also complains that occasionally the letters in written words appear jumbled. Nevertheless, she enjoys reading Harlequin romances, which she chose, her mother believes, because she could follow the plot despite her reading problems.

Plaintiff suffers incapacitating attacks of sudden, severe dizziness and nausea. The attacks arrive without warning and usually last two hours after which she is exhausted and must rest for several hours. Plaintiff testified she suffered daily attacks the week immediately prior to her administrative hearing. She takes medication three times per day in an attempt to manage the attacks. She does not like to be alone for fear she will have an attack with no one near to help her.

### B. *Medical History*

Plaintiff complains of various physical problems, including the following: Meniere's syndrome, tinnitus with vertigo, dizziness when she bends or stoops, fatigue caused by heart problems, frequent urination, stiff knee, back injury, nervous stomach, and inability to stand or sit for extended periods.

Dr. Richard Isaacson, M.D., is a urologist who began treating plaintiff for urinary tract problems, including frequent urination, in mid–1983. After several examinations, Dr. Isaacson concluded that her "frequency is functional rather than secondary to any pathologic process." (Rec. 340). *See also* (Rec. 335). He prescribed Cystospaz, which seemed to control her frequency problem. However, she stopped taking Cystospaz after a few years and her frequency problem returned. Plaintiff testified that she stopped taking the medication by order of Dr. Isaacson.

In 1988, plaintiff saw Dr. Eric Voth, M.D., complaining of an elevated heartbeat prior to menses. Dr. Voth noted that her palpitations were probably secondary to emotional distress or metabolic disturbances during menses. He prescribed Inderal. On July 12, 1988, plaintiff requested an additional prescription because she was leaving Topeka.

On March 29, 1989, Dr. Matthew McMahon, D.O., evaluated plaintiff for a Vocational Rehabilitation Program in Arizona. Plaintiff related a history of heart disease including one episode of increased pulse during which she lost consciousness. Dr. McMahon noted that plaintiff had no symptoms of dizziness or light-headedness. After examining her, and running an EKG, which was normal, he was "unable to define evidence of organic heart disease." (Rec. 238). However, he wrote that "[s]he may well have mitral valve prolapse," the evidence of which could have been masked by the medications she was then taking. *Id.* Nevertheless, he could find "no reason to deny her the training for her vocational rehab program." *Id.*

Dr. McMahon evaluated plaintiff again May 10, 1989. He diagnosed mitral valve prolapse syndrome with symptomatic palpitations. He concluded that plaintiff had "no

evidence of significant heart disease and [was] medically able, from a cardiac standpoint, to perform any form of cardiac rehabilitation." (Rec. 235).

On July 25, 1989, Dr. Richard Rupp, M.D., a cardiologist in Topeka, Kansas, examined plaintiff who was complaining of tiring easily when climbing stairs. Dr. Rupp noted she had undergone cardiovascular evaluations "at two or three different places in the west" which confirmed the presence of mitral valve prolapse with occasional periods of paroxysmal junctional tachycardia. (Rec. 287). He continued her medications.

Dr. Rupp wrote to the State of Kansas Department of Rehabilitation Services regarding plaintiff's condition September 14, 1989. In the letter, Dr. Rupp explained that plaintiff "has had no problems recently with cardiac arrhythmia and appears to be functioning quite adequately...." (Rec. 289).

On October 13, 1989, Dr. John Wertzberger, M.D., an orthopaedic surgeon, evaluated plaintiff on the request of the Kansas Rehabilitation Services. After a general examination, Dr. Wertzberger concluded as follows:

> there should be no restrictions on Mrs. O'Connor's capabilities, with the exception of obvious incapabilities from a standpoint of strength, which could not be considered close to the ability to perform repetitive lifting and bending activities. She should be in a sedentary work activity, due to her stature and physical development, however, she has no restrictions from the standpoint of use of her thumb and/or her spinal region, with the exception of the minimization of highly repetitive lifting and bending activities.

(Rec. 246).

Plaintiff saw Dr. Punya Arunakul, M.D., November 7, 1989, complaining of an earache, hearing loss, and jaw pain. Dr. Arunakul found no sign of serious infection and did not believe her ear and hearing problems required surgery. Instead, he concluded that she "has some hearing loss, right side more than the left, but would be able to correct the problem if [she] wears a hearing aid." (Rec. 249). Plaintiff last saw Dr. Arunakul December 13, 1989. In a report typed

January 23, 1991, Dr. Arunakul related that although he had not followed up with plaintiff since December of 1989, he believed that a hearing aid would adequately address her hearing problem and enable her to function.

On July 24, 1990, Dr. Rupp wrote to Dr. David Thurston, M.D., regarding plaintiff's general condition. Dr. Thurston was scheduled to perform arthroscopic surgery on plaintiff's right knee July 30. Dr. Rupp related no circumstances which would preclude the arthroscopic procedure. Dr. Thurston performed the procedure as scheduled. During the procedure he discovered loose cartilage, which he shaved. The procedure was successful.

On September 18, 1990, Dr. Rupp wrote a letter "to whom it may concern" in which he stated that plaintiff's problems were "well-controlled" and she required no specific physical restrictions in her activities. (Rec. 299). On October 13, 1990, plaintiff called Dr. Rupp's office complaining of a heart rate of 120. She called two days later complaining of a heart rate of 148.

Plaintiff was admitted to the Emergency Room at Stormont Vail Hospital, Topeka, Kansas, October 15, 1990, complaining of shakiness, nausea, and accelerated pulse. Three days later, Dr. Robert Ricci, M.D., performed an endoscopy. Dr. Ricci noted no indication of ulcerative disease nor mechanical gastric outlet obstruction. He also noted that "[i]t is conceivable that some of this patient's complaints are functional. She does come across as being somewhat anxious and this may be a factor accounting for some of her chronic complaints." (Rec. 259).

On March 4, 1991, plaintiff was admitted to the Emergency Room, Saint Francis Hospital, Topeka, Kansas, complaining of dizziness, nausea, and pain in her right ear. Dr. James McGovern, M.D., the Emergency Room physician, diagnosed vertigo and probable Meniere's syndrome and ordered her to follow up with Dr. Kirk Wanless, M.D. Dr. Wanless personally examined plaintiff on March 5, 1991. He then referred her to Dr. J.P. Werner, M.D., for an M.R.I., which was negative, and R. Joseph Stein, M.D., for further tests on her ears. Dr. Wanless personally examined plaintiff again on March 12, 1991, and

April 3, 1991. Apparently, Dr. Wanless suggested surgery as an option, however, no surgery was performed. Instead, Dr. Wanless prescribed several medications.

Although plaintiff did not visit Dr. Wanless' office after April 3, 1991, she did telephone on the following dates: April 21, 1991, August 13, 1991, and August 16, 1991. On April 3, 1991, she informed Dr. Wanless' staff she had obtained a medical card. On August 13, 1991, she complained of being very dizzy and nauseous. On August 16, 1991, she reported continuing bouts of dizziness and nausea.

On August 22, 1991, Dr. Rupp wrote Stephen Ternes, plaintiff's counsel. In his letter, Dr. Rupp explained as follows:

> [t]his lady has been followed through my office because of problems with palpitations. She has very minimal mitral valve prolapse that has not been physiologically significant. Her arrhythmia has been treated with Corgard and Verapamil. More recently, she has had problems with her ears which have caused more difficulty than her cardiovascular complaints. Her problems have been followed by Dr. Kirk Wanless and have primarily the complaints of "dizziness".

### C. *Vocational History*

In 1985, plaintiff worked at Flossie's Funnel Cakes, a kiosk-type food vendor in White Lakes Mall, Topeka, Kansas. She left Flossie's because of a back injury sustained when she slipped on a wet floor while carrying dirty pans to be washed. She held her job for one year. After she left Flossie's, she was unemployed until January, 1989. From January of 1989 to July of 1989, she worked as a stocker and cashier at a mini-mart in Arizona. After July of 1989, her only significant work experience involved approximately one month in micrographics, as a microfilm processor, at the State Office Building, Topeka, Kansas.

Plaintiff participated in vocational rehabilitation with the Kansas Department of Social and Rehabilitation Services from August 10, 1989, to November 25, 1991. In a letter dated November 25, 1991, Mary Iona Brown, a vocational rehabilitation services counselor, discussed plaintiff's participation in the program. Ms. Brown concluded that plaintiff is unemployable because of "a combination of physical and mental limitations which makes it difficult for her to get, or keep, jobs." (Rec. 357). When detailing these limitations, Ms. Brown specifically noted plaintiff suffers "periodic bouts of vertigo that require loss of work for bedrest." (Rec. 358).

Michael Dreiling is a vocational expert who testified at plaintiff's administrative hearing. Specifically, he responded to several hypothetical questions posed by ALJ Stout and Stephen Ternes, plaintiff's counsel. Mr. Dreiling classified plaintiff's past work as unskilled and of a light to medium exertional level. ALJ Stout asked Mr. Dreiling only one hypothetical. In response to that hypothetical, Mr. Dreiling stated that plaintiff could perform various jobs available in the national economy. Mr. Ternes then asked Mr. Dreiling several hypotheticals slightly varying the facts presented in ALJ Stout's question. The first hypothetical posed by Mr. Ternes asked Mr. Dreiling to assume a fictional person with a regularly occurring condition causing sudden dizziness and nausea. Mr. Dreiling opined that "it would be difficult for [such] a person to maintain full time, competitive employment, even at a sedentary unskilled level." In response to another hypothetical posed by Mr. Ternes, Mr. Dreiling stated that if a person had to break from work to use the rest room every 25 to 30 minutes, "it would be very difficult to sustain competitive work on a full time basis."

## IV. *SECRETARY'S DECISION*

In its July 13, 1993, decision, the Appeals Council made the following findings:

1. The claimant has not performed substantial gainful activity since December 17, 1990, the filing date of her current application for supplemental security income.

2. The medical evidence establishes that the claimant has the following severe impairments: borderline mental retardation with developmental and arithmatic [sic] disorders, episodes of

tinnitus associated with vertigo, vomiting, hearing loss and Meniere's syndrome, status post right knee arthroscopy and back injury, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant retains the residual functional capacity for a limited range of sedentary work but can not perform any work requiring significant public contact because of her hearing problems and the work should permit alternate sitting and standing.

4. The claimant is unable to perform her past relevant work as a hostess or as a fast food worker.

5. The claimant is 33 years old which is defined as a younger individual.

6. The claimant's past relevant work has been unskilled.

7. The claimant has a limited 10th grade education.

8. Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, Section 416.969 of Regulations No. 16 and using Rule 201.24, Table No. 1, Appendix 2, Subpart P, Regulations No. 4, as a framework for decisionmaking, would direct a conclusion of "not disabled."

9. Although the claimant's nonexertional limitations do not allow her to perform a full range of sedentary work considering the above cited rule as a framework for decisionmaking and the testimony given at the hearing, there are a significant number of other jobs in the national economy which she could perform. Examples of these jobs are sub-assembly jobs, electronics assembly, hand mounting in the photo industry, and microfilm operator. These jobs can be found in the thousands in the national economy.

10. The claimant was not disabled on or before June 27, 1992, the date of the Administrative Law Judge's decision.

## V. DISCUSSION

▬ This is an action pursuant to 42 U.S.C. § 1383(c) to obtain judicial review of a final determination by the Secretary.[1] Review is limited to determining whether the Secretary's decision is based on substantial evidence and whether the Secretary applied the correct legal standard. *Hamilton v. Secretary of HHS*, 961 F.2d 1495, 1497 (10th Cir.1992); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.1988). If the Secretary's factual findings are supported by substantial evidence, the court must give them conclusive effect. 42 U.S.C. § 405(g). Substantial evidence must be more than a mere scintilla, but may be less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir.1989). However, the court is not free to reweigh the evidence or substitute its judgment for that of the Secretary. *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992). In applying these standards, the court must bear in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze*, 345 F.2d 894, 897 (10th Cir.1965).

The parties' motions present the court with three questions. First, whether the Secretary's decision that plaintiff has the residual functional capacity to perform limited sedentary work is supported by substantial evidence? Second, whether the Secretary erroneously concluded that plaintiff is unemployed because she lacks the motivation to work? Third, whether the Secretary erred by failing to consider plaintiff's Appeals Council brief? Because the court finds that

---

1. Section 1383(c)(3) provides, in pertinent part, as follows: "[t]he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Secretary's final determinations under section 405 of this title."

the Secretary's decision regarding plaintiff's ability to perform limited sedentary work is not supported by substantial evidence, the court does not reach the second or third questions.

Plaintiff argues the Secretary "clearly overlooked substantive evidence which shows that Plaintiff lacks the ability to do even a limited range of sedentary work." Plaintiff's Memorandum in Support (Doc. 7), filed January 6, 1994, at p. 8. Specifically, plaintiff contends the Secretary disregarded the individual and combined effects of plaintiff's Meniere's syndrome, need to urinate frequently ("frequency"), and fatigue.

ALJ Stout issued a lengthy decision in which he addressed and evaluated each of plaintiff's problems; both physical and mental. He specifically examined whether plaintiff's Meniere's syndrome, frequency, and fatigue would render her disabled. He first dismissed plaintiff's heart-related fatigue claim as unsupported by the record. Subsequently, after analyzing the record, and mechanistically applying the framework from *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), he found that plaintiff's testimony regarding the extent to which she is limited by Meniere's syndrome and frequency was not credible.

At the beginning of its written opinion, the Appeals Council adopted much of ALJ Stout's decision. More precisely, the Appeals Council adopted the following: (1) "the [ALJ's] statements as to the pertinent provisions of the Social Security Act, the Social Security Administration Regulations, the Social Security Rulings, the issues in the case and the evidentiary facts," (Rec. 4); (2) the [ALJ's] "findings and conclusions on the ultimate issue of disability, except as modified herein," (Rec. 4); and (3) "the [ALJ's] sequential evaluation as set forth in his decision except that the Appeals Council finds that the claimant has the residual functional capacity for limited sedentary work with significant nonexertional limitations," (Rec. 4–5).

■ The court finds that the Appeals Council adopted ALJ Stout's credibility analysis and conclusions with regard to the individual and combined effects of plaintiff's Meniere's syndrome and frequency. To the ex-

tent plaintiff argues the Secretary erred by overlooking the effects of these two conditions, the court disagrees. Instead, the court finds that the Secretary considered these conditions, but discounted plaintiff's assessment of their individual and combined effects. Accordingly, the actual question presented is whether the Secretary erred by discounting plaintiff's testimony. To answer this question, the court must examine whether the Secretary's analysis comported with the applicable legal standards and whether the Secretary's conclusions were rational—that is, supported by substantial evidence.

■ The ALJ is the trier of fact and, as such, his credibility determination is entitled to great deference. *Casias v. Secretary of HHS,* 933 F.2d 799, 801 (10th Cir.1991); *Fowler v. Bowen,* 876 F.2d 1451, 1455 (10th Cir.1989); *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir.1988). Nevertheless, the court is not merely to rubber stamp the ALJ's credibility determination. *Cf. Mitchell v. Weinberger,* 404 F.Supp. 1213, 1215 (D.Kan. 1975) (explaining that although court does not review *de novo,* it will not abdicate its authority to review whole record to verify existence of substantial evidence). If the ALJ finds the plaintiff lacking in credibility, he must make specific findings and state reasons for his disbelief. *Caldwell v. Sullivan,* 736 F.Supp. 1076, 1081 (D.Kan.1990). For example, the ALJ may discount a plaintiff's subjective complaints where there is a lack of objective corroborating evidence. *Diaz v. Secretary of Health and Human Services,* 898 F.2d 774, 777 (10th Cir.1990). However, if the findings supporting the ALJ's conclusion are unsupported by substantial evidence, the court may disregard the ALJ's determination as to plaintiff's credibility. *See Caldwell,* 736 F.Supp. at 1082. Accordingly, the court now examines whether the ALJ's credibility conclusions, which were adopted by the Appeals Council and, therefore, the Secretary, as to plaintiff's Meniere's syndrome and frequency are supported by substantial evidence.

Plaintiff testified that as a result of Meniere's syndrome she experiences sudden and unexpected, severe attacks of nausea and

vertigo. The medical record contains frequent entries reflecting that plaintiff suffered persistent nausea, vertigo, and ringing in her ears. Indeed, her problems were documented by at least two treating physicians—Dr. McGovern and Dr. Wanless—at least two specialists by referral from Dr. Wanless—Dr. Werner and Dr. Stein—and resulted in several trips to the emergency room. None of her treating physicians found her complaints overstated or questioned her veracity. Nor did any physician find her symptoms to be without objective medical foundation. Her problems with nausea and vertigo were also catalogued by at least one non-medical observer: Ms. Brown, the counselor who assessed plaintiff's vocational potential and progress in the rehabilitation program administered by the Kansas Department of Social and Rehabilitation Services.

The Secretary discounted plaintiff's testimony regarding the severity and frequency of the attacks related to Meniere's syndrome for the following reasons: (1) lack of evidence in the medical record to substantiate her claims of daily attacks in the week prior to her administrative hearing; (2) the May 1991 general statement of her cardiologist, Dr. Rupp, that her problems were under control; (3) her mother's failure to mention nausea or vertigo during an interview related to plaintiff's disability claim; and (4) a vocational report to the effect that her problems with dizziness could be managed with a hearing aid.

Plaintiff also testified that she must urinate frequently. She stated she must get out of bed several times each night to urinate. She also stated that on a 100 mile trip in the family car she must stop to urinate three or four times. Her complaints are corroborated by the medical record. Indeed, the record reflects that Dr. Isaacson treated plaintiff for her frequency problem since mid–1983. The record also reflects that Dr. Isaacson prescribed Cystospaz which appeared to provide plaintiff with relief. However, for reasons unexplained by the medical record, Dr. Isaacson discontinued plaintiff's prescription and her frequency problems returned. Apart from medical corroboration,

plaintiff's testimony is further corroborated by her mother's observations.

Although there is considerable medical evidence regarding the duration of plaintiff's frequency problem, and detailing the treatment she has received for her problem, the Secretary focused instead on the lack of corroborating evidence in the vocational record. Because the vocational record nowhere chronicles instances of plaintiff's frequency problem, the Secretary discounted plaintiff's testimony, her mother's testimony, and the corroborating evidence contained within the medical record.

■ When reviewing a final decision of the Secretary, the court cannot affirm by isolating a few facts and calling them "substantial evidence." *Holloway v. Heckler*, 607 F.Supp. 71, 72 (D.Kan.1985). Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. *Musgrave*, 966 F.2d at 1374. The court has a "duty to scrutinize the entire record to determine whether the Secretary's conclusions are rational." *Holloway*, 607 F.Supp. at 72.

The court is well aware that credibility determinations are normally binding. *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir.1983). Nevertheless, in the instant case, the Secretary's findings supporting her determinations as to plaintiff's credibility are simply overwhelmed by, and often inconsistent with, the evidence in the record. The Secretary's determinations are not supported by substantial evidence and often are based only on conclusions supported by inferences tenuously drawn from questionable characterizations of omissions in the record.

As to the severity of plaintiff's Meniere's syndrome, the court finds that the Secretary gave undue weight to the following: (1) the absence of medical records for the week leading up to the hearing; (2) several statements made by her cardiologist; (3) her mother's failure to mention her daughter's Meniere's syndrome during an interview; and (4) comments in a vocational report to the effect that plaintiff's dizziness can be managed with a hearing aid.

First, the Secretary placed great emphasis on the absence of medical records substanti-

ating plaintiff's claims of daily attacks the week prior to her administrative hearing. The record is voluminous. Many documents are out of order and, possibly as a result, the record contains two nearly identical sets of office notes from Dr. Wanless. At page 348 of the record, there are two notations chronicling phone calls to Dr. Wanless' office from plaintiff on August 13, 1991, and August 16, 1991. On both dates plaintiff complained of dizziness and nausea. The administrative hearing was held August 21, 1991. The court finds that these entries directly contradict the Secretary's first reason for discrediting plaintiff's complaints.

Second, the Secretary appears to have relied on a very general statement made by Dr. Rupp, plaintiff's cardiologist, to detract from the force of plaintiff's testimony. It is unclear from the context of Dr. Rupp's statement whether he was referring only to her cardiac condition or intended also to pronounce upon her general medical condition. Although unlikely, even assuming he did intend to give his opinion about the status of her Meniere's syndrome, the court would defer to the opinions of those physicians consulted especially for treatment of this condition. Finally, since plaintiff did have other physicians whom she saw solely for her Meniere's syndrome, the court does not find particularly noteworthy that she did not discuss this condition with Dr. Rupp.

Third, the record of plaintiff's mother's interview is very brief. There is no indication of the nature, type, or extent of the questions asked. Given plaintiff's extensive and well-documented medical problems, the court finds the Secretary's attempt to contradict the existence of these problems by focusing on omissions in her mother's interview to be sophistic. However, even if the court were to find this method persuasive, the Secretary's conclusion would be suspect because, although not specifically referencing Meniere's syndrome, plaintiff's mother mentioned her daughter is afraid to be alone, a characteristic which plaintiff discussed at her hearing and attributed to the sudden and unexpected nature of the attacks and her need for assistance once they begin.

Fourth, the Secretary's conclusion regarding the sufficiency of a hearing aid appears based on the record of a telephone call from plaintiff to John Zobel on March 21, 1991. The record indicates only that plaintiff had elected to wear a hearing aid as an alternative to the surgical procedure suggested by Dr. Wanless.

The symptoms of plaintiff's Meniere's syndrome are well documented throughout the medical record and further substantiated in the vocational report submitted by Ms. Brown. The court finds that the Secretary impermissibly ignored the evidence as a whole choosing instead to abstract selectively pieces of evidence favorable to her position. *See Claassen v. Heckler,* 600 F.Supp. 1507, 1511 (D.Kan.1985). Accordingly, the court finds that the Secretary erred in discounting the effects of plaintiff's Meniere's syndrome.

As to plaintiff's frequency problems, the Secretary discounted a weighty body of objective medical evidence primarily because the vocational reports do not mention frequency or identify it as a potential problem. As with her Meniere's syndrome, plaintiff's frequency problems are well-documented throughout the medical record and further substantiated by her mother. The court finds that the Secretary's determination is overwhelmed by the record and approaches the level of mere conclusion. Accordingly, the court finds that the Secretary erred in discounting plaintiff's frequency. *Cf. Graham v. Sullivan,* 794 F.Supp. 1045, 1051 (D.Kan.1992) (explaining that "[t]hough deference is accorded an ALJ's credibility determination, [citation omitted], the determination still must be supported by the evidence and not overwhelmed by other pertinent evidence").

In the instant case, the Secretary acknowledged that plaintiff established a prima facie case of disability. Therefore, the Secretary had the burden to prove plaintiff has the ability to perform jobs available in the national economy. Because the court finds that the Secretary did not have adequate grounds to discount plaintiff's complaints regarding her Meniere's syndrome and frequency related problems, the court must reexamine the testimony of the vocational expert. The

hypothetical question posited by the ALJ presented a limited view of these two problems. More specifically, the scope of the ALJ's hypothetical was limited by the breadth of his credibility findings. In response, the expert opined that plaintiff could perform various unskilled, sedentary jobs, one example of which (microfilm operator) plaintiff already had demonstrated an inability to perform. On the other hand, the hypothetical questions posited by plaintiff's attorney presented a more complete view of her Meniere's syndrome and frequency related problems. In response to plaintiff's counsel's questions—one of which assumed a person who suffered sudden and unexpected, severe attacks of nausea and vertigo and another a person who had to urinate every 25–30 minutes—the expert admitted that his original opinion would not hold in that either of these two conditions would make it very difficult to sustain competitive work on a full time basis.

■ Because the Secretary's disability decision incorporated the recommendation of the vocational expert, and because that recommendation is based upon an erroneous credibility determination, the court finds that the Secretary failed to meet her burden. The court further finds that, taken as a whole, the record strongly supports a finding of disabled. This finding is, in part, further supported by both the vocational expert's responses to Mr. Ternes' hypothetical questions and the ALJ's taking administrative notice that if he "were to fully credit the claimant's testimony, work would be impossible...." (Rec. 95).

## VI. *CONCLUSION*

■ Where the Secretary fails to meet her burden, reversal is appropriate. *Harris v. Secretary of Health and Human Services,* 821 F.2d 541, 544–45 (10th Cir.1987). The court must choose either to reverse outright and direct an award of benefits or to remand for rehearing. 42 U.S.C. 405(g); *Harris,* 821 F.2d at 544–45. The record has been fully developed. There is substantial evidence that plaintiff's impairments preclude limited sedentary work. Indeed, given the court's findings as to the Secretary's negative credibility determinations, the record overwhelmingly supports a finding of disabled. Therefore, the court concludes that remand for additional fact-finding would serve no useful purpose but only delay plaintiff's receipt of benefits.

**IT IS BY THE COURT THEREFORE ORDERED** that plaintiff's motion for an order reversing the Secretary's decision (Doc. 7) is granted.

**IT IS FURTHER ORDERED** that the Secretary's motion for an order affirming her decision (Doc. 10) is denied.

**IT IS FURTHER ORDERED** that the Secretary's decision denying benefits is reversed and the matter is remanded to the Secretary for an immediate award of disability benefits.